Good morning, Your Honors. My name is John Maley, and I'm here representing the appellants Burien Nissan, Don Johnston, and his deceased wife. Can I ask you to speak up just a bit? Sure. I have soccer teams that I've been yelling at, so my voice is going. You know what I find out after eight years of coaching soccer? They can't hear you out on the field. That's why the European coaches sit in a chair and smoke a cigarette while playing. With a tie on it. Yeah. Go ahead. You and my wife think the same thing, Your Honor. Your Honors, the appellants here present four specific issues for the Court, but there is basically one overarching question. Yeah. Was the tax court clearly erroneous in making the factual determinations it did? That's correct, Your Honor. Okay. Let's start with their decision about the acquisition of the covenant not to compete. Was it before or after the adoption of Section 197? Well, Your Honor, I want to take one step back and talk about the argument that we make in our briefs, which is the absence, in this case, of findings by the tax court that the witnesses presented by the appellants lacked credibility. Because I think that is going to resound in each one of these issues. In fact, what the tax court did, as is obvious from the record, and we submitted the whole proceeding to the court, is that it chose to look at some of the documents and didn't look at others, ignored the testimony of the witnesses, and then said, this is what I found. Well, is what you're saying that they looked at the body of evidence presented to them and picked what they agreed with? Well, they picked some of the documents. Are you saying they just refused to read what you submitted? Well, I didn't do the trial, Your Honor. Your client submitted it. Well, what the tax court did not do is the appellants in this case presented evidence which supported the testimony which supported their position. The tax court obviously heard that testimony, but in making its written decision, did not determine that any of the witnesses lacked credibility. It simply made certain findings. What requires them to do so? Well, Your Honor, I believe that under the law, they are required, if there is uncontradicted testimony of witnesses, they are required to determine that it lacks credibility. Otherwise, they are obligated to say that the appellants in this case had met their burden of proof, and then it becomes the Commissioner's burden to prove by substantial evidence that the deficiencies the Commissioners found are, in fact, deficiencies. Initially, what they did was they looked at the document trail. They said the document trail established that they were necessarily saying, therefore, that they didn't believe the testimony that it establishes why. And we are reviewing this for clear error. Well, Your Honor, I think that's kind of the rub, is that you can make the assumption, I guess, that that's what the trial court would have done had they actually made findings, that by doing what it did, perhaps it determined that the testimony was not credible. Is there a ninth-degree law that requires them to do what you suggest? Your Honor, there is not. In fact, there are very few cases specifically addressing this point with regard to the tax court. There are some cases involving other Federal agencies which have different standards that don't really apply. The case that we cite in our reply brief, the Lurch v. Commissioner case, is a Seventh Circuit case, which talks about what happens when you have uncontradicted testimony and whether the tax court makes some determination of credibility. Obviously, Your Honor, the tax court did exactly what you said, which is it looked at certain documents and said, this is what we think happened, and therefore, we find deficiencies. Therefore, what they think happened didn't happen.  So why isn't that enough? Well, Your Honor, I'm not going to belabor this point, but I think that the law is, and the law that this Court should adopt on behalf of the Ninth Circuit is, is that there is uncontroverted testimony. The burden of proof in these cases – well, I'll back up one more step. The Commissioner is presumed to be correct when it finds deficiencies. And this is particularly true. The testimony that you're characterizing was not testimony about physical acts that happened. It was testimony that itself was characterizing transactions, right? In other words, what we have here is people describing a certain set of ascertainable money transactions as X or as Y. But for the most part, I agree with that. I mean, certainly there was – It's not exactly even a fact to be – Well, Your Honor – – credible or not credible. It's a characterization of a set of transactions. Well, except, of course, it's a characterization by the parties. Where the money came from and went to is not a dispute. That's true. Much of the testimony is – and I want to be careful what exactly I'm agreeing with you – but it is testimony by the parties to the transaction about what those transactions were. Just on this first one about when did Burien acquire the covenant, it's not as if your 13, 1993, prior to the adoption of Section 197, that shows this is when it was acquired. The testimony is, well, we didn't – we meant this, we intended that, it was the intention, et cetera, when, you know, the agreement is clear. There was an attempt to get it at one time. The agreement didn't go through. And then there was an agreement that was after the adoption of 197. Well, Your Honor, I think that question, if we focus specifically on that non-competition agreement, the question is, under Section 197, when is it acquired? And Section 197, like I think probably all tax regulations and statutes, is not particularly easy to grasp. And 197 uses acquired in a couple different contexts. It says, for example, that an amortizable intangible – excuse me. Oh. This is – we apologize. This happened once before. I was here and I saw it happening. Obviously, no one wants it. Good time to fill up your water. Yeah. Thank you, Your Honor. Let's stop the clock, too, please. Are you back, Judge? Yeah. I'm on. Okay. We lost you just for a second. Okay. Start the clock again, please. Thank you. Go right ahead. Your Honor, with regard to the Section 197 intangible, the Code says in one context that it is something that is acquired by the taxpayer after the date of enactment of this section. So after August 10, 1993. Then it talks about what are these intangibles that are acquired. And when we get to non-competition agreements, it says, any covenant not to compete entered into in connection with an acquisition, directly or indirectly, of an interest in a trade or business or substantial portion thereof. So we've got two acquisitions floating around. And I guess the question is, when was this non-competition agreement acquired? That's a different issue, I think, than when was it signed, when was the first payment made, when was the effective date under the agreement. But you would agree that a determination by a court like the trial court that it was acquired after August of 1993 is a factual fact. And in order for us to rule in your client's favor, we would have to find it clearly erroneous. Yes, Your Honor. But as I indicated earlier, I believe it's clearly erroneous because the uncontradicted testimony about when the parties considered themselves to have acquired this non-competition agreement was as of 1990 when this original stock sale was. Well, they might have acquired a, even if they acquired a non-competition agreement in some sense, i.e. in the contingent sense, they acquired the right to have it if X, Y, and Z happened. As it turned out, X, Y, and Z didn't happen, A. And B, the agreement that they actually got was, terms were different. I agree they were a little bit different, not substantially different. I mean, the money was – Half the money was different. The time period was different. The geographic area was described differently. I mean, not to quibble, but the geographic area was described differently, but essentially the same thing. The money was one percentage point different. I mean, they're – They were different. How can you call the same agreement on ten different terms? Well, Your Honor, I guess it would come back to this idea, is if you – if we are looking at when is something acquired, and we have a transaction which is modified by the parties at some point, is when is the noncompetition agreement acquired? Is it acquired as of the beginning of this acquisition of an interest in a business, or is it acquired – How can it be acquisition of an interest in a business? That's the other problem. Well, Your Honor, the testimony was by the parties that when they entered into this in 1990, financial conditions required them at some point after August of 1993 to revise that transaction. They changed it up, including changing some of the terms of the noncompetition agreement, and then the parties went forward with that transaction. So the question is – and the tax court obviously resolved this by saying, we're not going to say this acquisition of an interest in a business from which this noncompetition came from started in 1990 because you guys revised it after August 1993, and that's when we're going to say it was acquired. I think that because there was uncontradicted testimony by the parties that there was – that this was one long acquisition that started in 1990, that it became the commissioner's burden to prove. But acquisition is usually when A, who didn't used to own it, now owns it, right? That didn't happen until 1995 or something. Well, Your Honor, you know, acquisition isn't defined, and it is obviously possible for this Court to say that nothing – it's not acquired for purposes of Section 197 until the last payment's made and it changes hands. The first payment is made. The paper is signed. I mean, you can define it any way you want. But in fact, no payments were made until when? Well, after August 10th of 1993. Right. But what the statute says is any covenants that could be – And who owns Beery and Nissan on August 7th, 1991? What do they have been told? In 1991, I think – And the date of – whatever the effective date of the statute? August 9th of 1993, the day before it became effective. Well, what was the answer of it? Well, there was – there is a letter in the record from Don Johnston to the purchasers of the auto dealership after August 1993. In fact, it's October of 1993 that says, this agreement that we entered into has got all sorts of problems. You guys haven't made payments. You haven't done this, that, and this. I want something to happen. So if the question was, as of October 1993, what did Mr. Johnston think? What did one of the parties think? They thought that we still had an agreement. You just have to do X, Y, and Z because you're in breach. They hadn't acquired. You're in breach of the agreement. And they didn't own it and they hadn't acquired it. Well, there was an agreement in place to acquire. Sure. The one piece of all the pieces of money moving around, the one set of money I could not understand what your position is about is $43,000 and some large dollars. Okay. I could not understand the transaction as you were characterizing it at all. Here is what happened, and hopefully I'm clear. There was a payment made of $45,483, and it was made by Beery and Nissan to Don Johnston. The testimony was it was made to Don Johnston in his capacity as the general partner for the Johnston Family Partnership in repayment of a loan. There's no dispute that there was, in fact, a series of loans from the partnership to Beery and Nissan, and there's no dispute that there was a payment of in excess of $300,000 in repayment of some of that loan by Beery and Nissan to, and the check is made out to, Don Johnston Johnston Family Partnership. That was the person. The appellants in this case say that payment of $45,483 was the completion of the repayment of that loan, of which there's no dispute that the loan existed. What the commissioner determined and the tax court agreed with was, is that that $45,483 was a lump sum payment owing under the non-competition agreement, even though it wasn't exactly the same number as the number under the non-competition agreement. The non-competition agreement talked about a lump sum payment of $48,503. The commissioner said, well, it was close enough. We're going to say that that was a non-competition payment. You have to report it as income. The parties didn't. The parties reported it as repayment of a loan. Our position is it's exactly what the parties said it was. And, Your Honor, our position on this is the same as our position on the other issue in this case, the third issue, which is the, whether the $290,000 should be attributed to a non-competition agreement, which was, if you have a loan, a preexisting loan, it makes sense that the parties expect to be repaid on that. The commissioner and the tax court apparently don't think that the parties expect to be repaid. They think that if there's a payment that's close enough to a lump sum payment that was owing under a non-competition agreement, that that's what it was, instead of repaying money that was already loaned and owing. Your Honors, I have a little less than five minutes. I think you fairly well understand our points. I'm glad I was able to clarify that issue. I'm going to reserve the rest for rebuttal. Thank you. Roberts. We'll go to the Commissioner at this time. Your Honor, may it please the Court. My name is Carol Barthel, speaking for the Commissioner. On all four of these issues, as the Court is aware, the Commissioner's determination is presumed correct, and the taxpayers bore the burden of showing that it was not correct by the preponderance of the evidence. And, as the Court has noted, the tax court's conclusion that they failed to bear this burden is reviewed for clear error, and it's obviously not clearly erroneous in any of the instances of the four issues here. The non-competition agreement was acquired by the taxpayer after the effective date of Section 197. The 1990 non-competition agreement never became effective, never became legally binding, because it was subject to conditions precedent that were not fulfilled. Maria Nisant never paid for Johnston's majority interest in the corporation. Therefore, there is no option closing. Therefore, Johnston was never bound not only by the competition not to compete, but he was not bound to execute the covenant not to compete, and, in fact, he did  In fact, the letter that Mr. Manley mentioned on October 14, 1993, well after the effective date of Section 197, Johnston put Maria Nisant on notice that it was in breach. I suppose there would at least be a better argument, and there might be a coherent argument, that something was acquired earlier, i.e., the right to traditionally enter into this. That might well be the case.    They didn't. They didn't. They didn't. They didn't have anything at this point, at the point at which 197 became effective. They hadn't paid for anything, and they had not acquired anything with respect to the non-competition agreement. They hadn't. The conditions precedent had simply not been fulfilled. And Johnston put them on notice that they were in breach and that he was requiring the full forced sale, which was the only remedy that the contract provided for breach. Instead of a forced sale, they went ahead and renegotiated the agreement in 1993 and 94. The later agreement clearly superseded the previous ones. It was, in fact, an agreement under which the covenant was acquired. Payments were made, including both the lump sum payment and the monthly payments. The lump sum payment and the monthly payments, the first of the monthly payments, were made on exactly the same day, which is an indication that, to skip to the second issue, that lump sum payment was for the covenant not to compete and was not related to any sort of payment of interest on a loan or anything of that sort. Contrary to Mr. Marley's argument, it's not the acquisition date of the shares that 197 refers to. The statutory language talks about an intangible acquired by the taxpayer after the date of enactment. And even if it were the acquisition of the shares that was relevant, Johnston's majority interest, the shares at issue, were not acquired until 1993-94, until the end of 93. That is, after the effective date of the statute. The preponderance of the evidence here includes not just testimony, but also the 82 exhibits in the record and the stipulation of the parties related to most of those exhibits. The Court noted that the taxpayers had mischaracterized the key transactions in this proceeding, which perhaps is a bit of a reflection on the credibility of the witnesses as well as the taxpayers as the parties. As the Court has noted, the testimony was primarily characterizing the transactions rather than actually adding to the transactions. With respect to the Brea Nissan's payment to Johnston in 1994 of the compensation for the noncompetition agreement, which should have been reported as income to Johnston, it was not just generally the amount, as Mr. Meehan has stated. It was not just generally the amount indicated under the noncompetition agreement. It was precisely the amount minus the $20 that one of the buyers had said that the payments didn't add up to. Of course, what's interesting about this is that it's a very odd number. And it was probably derived from something else, i.e., the company not to compete was probably not changing the structure of money that was perhaps really serving some other function. Where did they get that number from? I could not tell you. I'm really not aware of how the numbers were derived. But one thing that I am interested in is the $290,000. And the general statement that you can't assign income so that the problem to me about it is, does that mean that if an arrangement is made to pay over the money to X, we're supposed to pay it over to Y, and then it doesn't? That Y is paying income tax on it even though they never got the money? I think that perhaps the most helpful of the cases that either party has cited in connection with this issue is this Court's own decision in Kachansky dealing with a contingent fee that was to come out of a settlement to an attorney and hadn't come out yet, but the attorney and his wife, meanwhile, got divorced. And as part of the divorce settlement, the contingency fee was split. This Court held that is income to the lawyer and not to his wife because he was the one who earned the income, that it was income to him. In the same way, here we have Mr. ---- But could it possibly be income to neither of them yet? Until somebody gets ---- it's one thing to say ask between A and B because A is money. But is it anybody's money until they actually get it? That's what I'm asking. In this case, it was paid as part of a lump sum payment to Don Johnston Incorporated for assets of the corporation. But the documentation of all of the contracts between the parties allocated this sum, this particular sum, to the covenant not to compete, which was not between Don Johnston Incorporated and the buyers, but was between Johnston and the buyers. But Donald Johnson Incorporated was a escrow company. It was somebody unoccupied, and just never paid over the money. They just kept it, stole it. Does Johnston still have to pay income tax fund? I think, as one of the earlier attorneys referred to, an action for money he hadn't received or something of the sort, I think, I think the taxpayer would have some sort of an action there. But it should be his money. As far as the IRS is concerned, if he's earned it, if he is the one who agreed. That's correct. I'm happy to just speak with my employer, and I say they owe me $200,000 more than they paid me. And it proves up eventually, in five years, that it's determined that they did owe it to me. I have to pay income tax. Do I have to pay income tax before I ever got the money and before I was ever determined it belonged to me? I think I'd have to see the particular facts of that case, Your Honor. But in the cases of Covenants Not to Compete, it's pretty clear that even if the company receives the money and puts it on its books as a payable to Johnston, as was half the case here, even if Johnston lets them keep it, nonetheless, it is Johnston's money. He earned it. And he had the right to keep it. Ms. Barthel, is that the case, even though Johnston is a cash basis as opposed to an accrual basis taxpayer? Well, in this particular case, we also have the complication, or perhaps it is simplification, that the money was paid in a check to his S Corporation, which also did not report it as income tax. Well, I know, but you were talking about people having to pay income tax on money they never receive because the obligor treats it as a payable pursuant to a contract on the obligor's books. But if the obligee is a cash basis taxpayer, why would the obligee have to recognize it as income? I'm not quite sure that that gets into it. I'm not quite sure how that would work, Your Honor. In this case, the accrual and the methods of accounting really were not at issue. Well, I would think they weren't. But, I mean, if the government doesn't pay me my salary, I sure don't have to report it, even though they owe it to me. I mean, if I'm a cash basis taxpayer. I would have to look into that. I don't know quite what the situation would be. Okay, fine. But in this case, the services were performed by Johnston. He was the one to whom the money was owed. He was the one who was the taxpayer under the contract. He was the recipient. And, therefore, he should have reported that money. And I note that his S-Corporation also did not report the money. So nobody reported it as either income from sale of assets or as ordinary income from compensation purposes. I'm sorry? Would it have made a tax difference which one reported it? Suppose the S-Corporation had reported it. If the S-Corporation had performed it, and, in fact, the cases that Mr. Maley cites in his reply brief, the Court held that the Corporation basically had performed one thing or another. They were not necessarily covenants not to compete. They were not, in fact. If, in fact, it had been the Corporation that had agreed not to compete, then it would have been income to the Corporation. But that was not the case here. It was Mr. Johnston personally who agreed not to compete. That's understandable because he was the one with a great deal of experience in the automobile industry, as the record makes quite clear. I think we have your arguments well in hand. Why don't we see what counsel has to say in rebuttal. Thank you, Your Honor. Thank you very much for appearing here today. Counsel? Thank you, Your Honor. I'm just going to talk briefly about the third of the four issues, this notion that $290,000 should be attributed as income to Mr. Johnston from the payment made by Burian Nissan to Don Johnston, Inc. And in our reply brief, well, the theory that the tax court used to support this and that the Commissioner argues in support of it is this assignment of income theory, that the recipient of the income, Mr. Johnston, can't avoid taxation by assigning it to somebody else. Well, there's two problems with the application of this theory. One, there's no evidence that anybody signed anything to anyone. In other words, Mr. Johnston didn't, wasn't getting a payment from Burian Nissan and said, give it to them instead so I don't get attributed to the income. The strange thing here is that the money went up in the air. Johnston didn't – Don Johnston didn't report it as income and Johnston – either of them reported it as income. So what was it? It was sitting in somebody's bank account. You know, Your Honor, I – when counsel made that statement that Don Johnston, Inc. didn't report it as income, I didn't recall that as being the case, but I honestly can't say that I know for a fact that they didn't do it. I will assume that that's the case. I don't know, frankly, that that ought to make a difference in this instance because we're not talking about the taxes that Don Johnston, Inc. owes. Well, it certainly suggests that Don Johnston, Inc. didn't think it was theirs. Well, I don't know what it suggests, Your Honor, because we didn't have any – as far as I know, there's no deficiency. There hasn't been the question of evidence about what they did or didn't consider it as. But I think that the second point – the first point is there wasn't an assignment. There's no evidence of an assignment. But even assuming assignment of income is somehow an appropriate thing to consider, in our reply brief we cite a case, Sergeant v. Commissioner, which talks about overuse of the assignment of income doctrine and specifically talks about it in the context in which it makes sense, which is a corporate entity that is disregarded, that basically exists as some sort of shell to pass through income or to hold on to income. There's no evidence in this case. Well, this certainly feels that way, given the fact that it was Don Johnston, the person who earned the accountant not to compete, and it was Don Johnston, the corporation that had the money and was keeping it. Your Honor, I suppose you could say that, except for the fact that, as you're well aware, the mere fact that somebody has a corporation in which it's named after them and they're the sole shareholder and the president, the vice president, the chairman of the board. Well, they got a bunch of money. Okay. And at the time they got it, nobody had earned anything because, arguably, Mr. Johnston doesn't earn it until he fulfills his agreement not to compete. So that would be as it was with the initial noncompetition agreement over time. You earn it over time by not competing. Well, yes, but if what we're talking about is who had earned it, well, nobody had earned it because nobody had done anything yet. But I think the essential question is, if we're going to go with his assignment of income doctrine, the assignment of income doctrine appears to require   using a corporate entity. And that would require some evidence by someone that that was, in fact, the case. And the point I was making was that, notwithstanding the fact that there is a corporation that is owned by an individual and the individual is every person in that corporation, the corporation is named after them doesn't mean it's not a separate legal entity. The assignment of income doctrine is applied in the situations where corporate entities are not followed. There's nothing in this case that indicates that Don Johnston, Inc. was anything other than Don Johnston, Inc. and behaved exactly like a corporation. The $200,000 that was due to Don Johnston, the individual, was in repayment of a loan, a loan that nobody disputes. I'm asking you, how did Don Johnston, Inc. end up with $200,000 that was due to Don Johnston, the individual, if they weren't disregarding corporate entities? And have it in his bank account and use it for something else? Well, the agreement between Bureau and Nissan and the parties – my time has run out, so let me finish my sentence. The agreement between the parties was that the money goes to Bureau and Nissan. Bureau and Nissan not only had the obligations that it had under this agreement, but it had all sorts of other obligations. So Bureau and Nissan was – or Don Johnston, Inc. at that point was able to do whatever they wanted to with that money, regardless of whether Mr. Johnston individually had some agreement not to compete or not. Bureau and Nissan did what it did in this case, which was repay a loan that Mr. Johnston had made. Mr. Johnston didn't report that $200,000 he received as income because it was repayment of a loan. I can't account for what Don Johnston, Inc. did or didn't do. Thank you, Your Honor. Thank you. Thank both counsel for their arguments. The case just argued will be submitted for decision, and the court will stand in recess for the morning.
judges: Thompson, Hawkins, Berzon